# SUPREME COURT OF THE UNITED STATES

———

Nos. 24–109 and 24–110

———

LOUISIANA, APPELLANT

24–109          *v.*

PHILLIP CALLAIS, ET AL.


PRESS ROBINSON, ET AL., APPELLANTS

24–110          *v.*

PHILLIP CALLAIS, ET AL.

ON APPEALS FROM THE UNITED STATES DISTRICT COURT FOR
THE WESTERN DISTRICT OF LOUISIANA

[June 27, 2025]

These cases are restored to the calendar for reargument. In due course, the Court will issue an order scheduling argument and specifying any additional questions to be addressed in supplemental briefing.

JUSTICE THOMAS, dissenting.

I respectfully dissent from the Court's decision to set these consolidated cases for reargument. Congress requires this Court to exercise jurisdiction over constitutional challenges to congressional redistricting, and we accordingly have an obligation to resolve such challenges promptly. That resolution is particularly critical here, as these cases highlight the intractable conflict between this Court's interpretation of §2 of the Voting Rights Act of 1965 (VRA), 52 U. S. C. §10301, and the Equal Protection Clause of the Fourteenth Amendment to the Constitution. The Constitution is supreme over statutes, *Marbury* v. *Madison*, 1 Cranch 137, 178 (1803), and no intervening developments will change that. I thus see no reason to avoid deciding these cases now. In doing so, I would make clear that where

this Court's interpretation of §2 breaches the Constitution's equal protection guarantee, the Constitution controls.

## I

These consolidated cases involve a constitutional challenge to Louisiana's most recent congressional districting map, Senate Bill 8 (SB8).  The State passed SB8 in response to a District Court order that required Louisiana to create an additional majority-black district to avoid "vote dilution" and comply with §2 of the VRA.  See *Robinson* v. *Ardoin*, 605 F. Supp. 3d 759 (MD La. 2022).  The Fifth Circuit vacated that order prior to SB8's enactment.  See *Robinson* v. *Ardoin*, 86 F. 4th 574, 600 (2023).  Nevertheless, because of the vacated order, two of SB8's six congressional districts are majority-black—roughly tracking the proportion of black Louisianans statewide—while the State's previous map included only one such district.

The plaintiffs here sued to enjoin Louisiana's use of SB8, alleging that the congressional map's second majority-black district amounted to an unconstitutional racial gerrymander.  Because the plaintiffs challenged "the constitutionality of the apportionment of congressional districts," a "district court of three judges" was convened to hear the suit. 28 U. S. C. §2284(a).  Observing that SB8's "second majority-minority district . . . stretches some 250 miles from Shreveport in the northwest corner of the state to Baton Rouge in southeast Louisiana, slicing through metropolitan areas to scoop up pockets of predominantly Black populations from Shreveport, Alexandria, Lafayette, and Baton Rouge," the court concluded that the map effected a racial gerrymander that "violates the Equal Protection Clause." *Callais* v. *Landry*, 732 F. Supp. 3d 574, 582, 588 (WD La. 2024).[1]  The State and intervenor-appellants appealed directly to this Court.  See §1253 (providing right to "appeal

_____
[1] The three-judge court also drew support for its conclusion from "statements made by key political figures . . . , all of whom expressed that the

to the Supreme Court" from an order granting a preliminary injunction in any action "heard and determined by a district court of three judges"). Despite the cases having been fully briefed and argued, the Court today punts without explanation.

## II

We should have decided these cases this Term. These are the only cases argued this Term in which our jurisdiction is mandatory. See *ibid.* That an Act of Congress requires that we decide these cases should have prompted us to resolve them expeditiously.[2]

These cases also warrant immediate resolution because, due to our Janus-like election-law jurisprudence, States do not know how to draw maps that "survive both constitutional and VRA review." Brief for Appellant 53. As Louisiana recognizes, the question whether it can demonstrate that SB8 complies with the Constitution in this suit is intertwined with the legitimacy of the *Robinson* court's §2 ruling in prior litigation. See Tr. of Oral Arg. 28 (counsel for Louisiana stating that the Court "can't assess the legality of [Louisiana's] map" under the Equal Protection Clause without also analyzing the §2 ruling in "the *Robinson* litigation"). The State's reliance on the *Robinson* District

––––––––––

primary purpose guiding SB8 was to create a second majority-Black district due to the *Robinson* litigation." 732 F. Supp. 3d, at 604; see also, *e.g.*, *id.*, at 587 (SB8's sponsor professing that "'we all know why we're here. We were ordered to draw a new Black district, and that's what I've done'").

[2] In 1976, Congress substantially curtailed its earlier, expansive use of three-judge courts. See §§1–3, 90 Stat. 1119. But, the amendments nevertheless expressly retained three-judge courts with a right of direct review to this Court for constitutional challenges to States' redistricting maps, see 28 U. S. C. §2284, signaling Congress's understanding that these cases are uniquely important and should receive "expedited Supreme Court correction, if necessary." M. Solimine, The Three-Judge District Court in Voting Rights Litigation, 30 U. Mich. J. L. Reform 79, 84 (1996).

Court's previous §2 ruling complicates its constitutional defense, however, because this Court's §2 jurisprudence is broken beyond repair. Most relevant here, the Court has construed §2 to require race-based districting under circumstances that do not remotely approximate the racial discrimination that such districting is supposed to remedy.

Although the Court has long recognized that its VRA jurisprudence and the Equal Protection Clause are in tension, see, *e.g.*, *Abbott* v. *Perez*, 585 U. S. 579, 587 (2018), its recent decision in *Allen* v. *Milligan*, 599 U. S. 1 (2023), has placed the VRA in direct conflict with the Constitution. The *Milligan* Court blessed the plaintiffs' effort to use §2 of the VRA to achieve "a 'proportional allocation of political power according to race'" through the creation of a second majority-black congressional district in Alabama. *Id.*, at 55–56 (THOMAS, J., dissenting). In doing so, the Court effectively established the following rule for §2: "If voting is racially polarized in a jurisdiction, and if there exists any more or less reasonably configured districting plan that would enable the minority group to constitute a majority in a number of districts roughly proportional to its share of the population, then the jurisdiction must ensure that its districting plan includes that number of majority-minority districts 'or something quite close.'" *Id.*, at 81.

Under the *Milligan* Court's construction of the statute, it is difficult to see how §2 imposes any real barrier to a district court providing a race-based remedy. Racial polarization in voting "continues to exist in most areas" and is "relatively easy to establish." R. Greenwood & N. Stephanopoulos, Voting Rights Federalism, 73 Emory L. J. 299, 311 (2023).[3] Nor is there any meaningful hurdle to

_____

[3] The *Milligan* plaintiffs' racial-polarization expert confirmed that, to the best of his knowledge, actionable racially polarized voting "has only been found to exist where whites tend to vote for Republicans." *Milligan* v. *Allen*, No. 2:21–cv–1530 (ND Ala., Jan. 18, 2022), ECF Doc. 105–2, p. 230. The Court's interpretation of §2 already "immerse[s] the federal

creating illustrative maps with additional majority-minority districts; modern computing power makes this task all but perfunctory, and, on the logic of at least the *Milligan* plurality, such districts can be "'reasonably configured'" even if they are "palpable racial gerrymanders" that a State could never enact in the first instance. *Milligan*, 599 U. S., at 59 (THOMAS, J., dissenting).[4]

In effect, the upshot of *Milligan* is that whenever a State feasibly *can* create an additional majority-minority district, it *must* do so—at least up to the point of racial proportionality—even though the conditions triggering racialized redistricting are utterly divorced from the sort of "specific, identified instances of past discrimination" that this Court demands to justify a race-based remedy. *Students for Fair Admissions, Inc.* v. *President and Fellows of Harvard College*, 600 U. S. 181, 207 (2023); see also, *e.g.*, *Gratz* v. *Bollinger*, 539 U. S. 244, 270 (2003) ("Racial classifications are simply too pernicious to permit any but the most exact connection between justification and classification" (internal quotation marks and alteration omitted)). That interpretation of §2 runs roughshod over our admonition that "[r]acial classifications with respect to voting carry particular dangers" and "deman[d] close judicial scrutiny," *Shaw* v. *Reno*, 509 U. S. 630, 657 (1993), and plainly "is not congruent and proportional to any provisions of the Reconstruction

--------

courts in a hopeless project of weighing questions of political theory," *Holder* v. *Hall*, 512 U. S. 874, 892 (1994) (THOMAS, J., concurring in judgment); that the political theory may have partisan valence is cause for further concern.

[4] The *Robinson* plaintiffs may have taken such an approach here. One of their mapmaking experts, William Cooper, is the same expert who drew racially gerrymandered maps in *Milligan* and "treated 'the minority population in and of itself' as the paramount community of interest in his plans." *Milligan*, 599 U. S., at 58 (THOMAS, J., dissenting). In the *Robinson* litigation, Cooper "freely admitted" that he deliberately drew maps with two majority-minority districts. *Robinson* v. *Ardoin*, 37 F. 4th 208, 222 (CA5 2022).

Amendments," *Milligan*, 599 U. S., at 81 (THOMAS, J., dissenting).

These cases put the Court to a choice: It may permit patent racial gerrymandering under the auspices of §2 compliance, or it may admit that, as the Court has construed the statute, a violation of §2 is insufficient to justify a race-based remedy. That decision should be straightforward. Nevertheless, the Court demurs.

*          *          *

For over three decades, I have called for "a systematic reassessment of our interpretation of §2." *Holder* v. *Hall*, 512 U. S. 874, 892 (1994) (opinion concurring in judgment). The Court's decision in *Milligan* is the latest and most damaging "installment in the 'disastrous misadventure' of this Court's voting rights jurisprudence." *Alabama Legislative Black Caucus* v. *Alabama*, 575 U. S. 254, 294 (2015) (THOMAS, J., dissenting). I am hopeful that this Court will soon realize that the conflict its §2 jurisprudence has sown with the Constitution is too severe to ignore. Because the Court declines to reach that conclusion today and instead inexplicably schedules these cases for reargument, I respectfully dissent.